PILLSBURY WINTHROP SHAW PITTMAN LLP
ROBERT L. WALLAN (SBN 126480)
robert.wallan@pillsburylaw.com
MARIAH L. BRANDT (SBN 224076)
mariah.brandt@pillsburylaw.com
REBECCA TIERNEY (SBN 274283)
rebecca.tierney@pillsburylaw.com
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
Telephone:     213.488.7100
Facsimile:     213.629.1033

Attorneys for Plaintiff IN-N-OUT BURGERS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN-N-OUT BURGERS, a California corporation,<br><br>        Plaintiff,<br><br>   vs.<br><br>ZURICH AMERICAN INSURANCE COMPANY,<br>        Defendant. | Case No. 8:21-CV-406<br><br>**COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff In-N-Out Burgers ("Plaintiff" or "In-N-Out") complains against defendant Zurich American Insurance Company ("Zurich") as follows:

## I.    NATURE OF THE ACTION

1.      This action arises out of Zurich's denial of coverage under an "all-risk" insurance policy for business interruption losses suffered by In-N-Out resulting from the "novel coronavirus" or SARS-CoV-2 virus and the Coronavirus Disease 2019 ("COVID-19") pandemic.

2.      This complaint ("Action 2 Complaint") is similar in most respects to the first amended complaint ("Action 1 FAC") filed on June 9, 2020 in the Central District of California in *In-N-Out Burgers v. Zurich American Insurance Company*, Case No. 8:20-cv-01000-KES before the Honorable Josephine L. Staton.  Action 1 Dkt. 8.  In-N-Out anticipates Action 2 will have the same general facts, witnesses, and

-1-

1    arguments as in Action 1.

2        3.    The key difference is that the Action 2 Complaint encompasses: (1)

3    losses claimed under a new policy term, (2) additional losses stemming from In-N-Out

4    locations opened after the end of the last policy term, and (3) new factual data

5    regarding the novel coronavirus, COVID-19, and its spread throughout the world that

6    had not yet developed or was not as well understood when Action 1 was filed.

7        4.    The allegations in this Action 2 Complaint should have been incorporated

8    into an amended or supplemental complaint in Action 1 and satisfied all requirements

9    to amend or supplement under Federal Rule of Civil Procedure 16(b).  In-N-Out met

10   and conferred with Zurich's counsel in Action 1 pursuant to California Central District

11   Rule 7-3 on January 28, 2021, explained in detail the proposed amendment and/or

12   supplement, and proposed entering into a joint stipulation to modify the scheduling

13   order and a joint stipulation to allow filing of an amended complaint.  *See* Judge

14   Staton's Standing Order p. 5 at § 8.b., p. 6 at § 9.b.; Federal Rule of Civil Procedure

15   15(a)(2).  Zurich represented that it would take the request under consideration.   On

16   February 8, with no investigation and no further communication with In-N-Out

17   regarding the request to amend and/or supplement the Action 1 FAC, Zurich filed a

18   motion for judgment on the pleadings.  Action 1 Dkt. 33.  Zurich concurrently

19   provided a letter from its counsel in which it refused to agree to an amendment, taking

20   the position that there was no possibility of coverage regardless of the new locations,

21   added policy year, new virus variants, and expanded positive diagnoses of In-N-Out

22   associates.

23       5.    The policy renewal at issue in this Action 2 Complaint has the same

24   policy language as that in Action 1.  It remains an "all-risk" policy drafted by Zurich

25   expressly <u>including</u> coverage for many types of contamination, including radiation,

26   ammonia, virus, pathogen or pathogenic organism, and disease-causing illness or

27   agent.

28

-2-

6.     In-N-Out continues to suffer ongoing direct physical loss of or damage to property and resultant economic losses arising from the pandemic under The Zurich Edge™ commercial property insurance policy (the "Policy").  Specifically, Action 1 pertains to the June 1, 2019 to June 1, 2020 policy period (the "2019/2020 Policy Period"), policy No. MLP 9137890-13.  This action pertains to the June 1, 2020 to June 1, 2021 policy period (the "2020/2021 Policy Period"), policy No. MLP 9137890-14.  The Policy provides for $500 million in limits – $250 million for each policy period per occurrence.

7.     In-N-Out submitted a claim for business interruption and other covered losses arising in connection with the novel coronavirus and ongoing COVID-19 pandemic for the 2019/2020 Policy Period and for the 2020/2021 Policy Period. Zurich denied coverage for the 2019/2020 Policy Period.  In-N-Out believes Zurich has universally denied all COVID-19 pandemic-related business interruption claims submitted by any of its policyholders.  In-N-Out communicated its claim under the 2020/2021 policy as part of its effort to obtain Zurich's consent to an amendment of its First Amended Complaint in Action 1.  On February 5, 2021, In-N-Out also submitted a notice of loss via its broker to Zurich for the 2020/2021 Policy Period. On February 8, concurrent with filing its motion for judgment on the pleadings, Zurich provided its written position via counsel that there is no coverage under the Policy regardless of the new allegations, thereby denying coverage and breaching its contract.

## II.     <u>PARTIES</u>

8.     In-N-Out is a California corporation with its principal place of business in Irvine, California.  In-N-Out is a well-known and successful chain of quick-service restaurants specializing in award-winning hamburger and cheeseburger sandwiches.

9.     In-N-Out is informed and believes, and based thereon alleges, that Zurich is a New York corporation with its principal place of business at 1299 Zurich Way, Schaumburg, IL 60196.

-3-

COMPLAINT
Case No. 8:21-CV-406

**III.    JURISDICTION AND VENUE**

10.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because In-N-Out and Zurich are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

11.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(2) as a substantial amount or part of the events or omissions giving rise to the claim occurred in this district.

**IV.    FACTUAL BACKGROUND**

**A.    In-N-Out**

12.    For over 70 years, In-N-Out has operated a highly recognizable and successful chain of quick-service restaurants specializing in the highest quality hamburger and cheeseburger sandwiches and other products and services.

13.    It currently operates more than 360 locations predominantly in California, and also in Arizona, Nevada, Utah, Oregon, Texas, and Colorado.  Several locations have opened since June 2020 when the 2020/2021 Policy Period commenced.

14.    Celebrated for its fresh food and other high standards of quality, In-N-Out consistently rates with the press as the top quick service restaurant in customer satisfaction surveys.

15.    In-N-Out's commitment to its associates has resulted in recognition as one of the best places in the country to work. Glass Door has recognized In-N-Out as number four on its list of best places to work in the United States, ahead of Google, Southwest Airlines, John Deere, and many other highly regarded companies across all of American industry.

16.    In-N-Out is known for its drive-through operations, but the vast majority of all In-N-Out locations have dining rooms and outdoor eating areas where customers walk up and place orders inside the restaurants, choosing to either dine at the restaurant or take their food to go.

-4-

17.    As a part of its prudent business practices, In-N-Out maintains insurance coverage. In-N-Out specifically maintains "all risk" coverage with Zurich, covering not only more commonly known risks like fire, but also entirely unknown and novel risks that may arise which were not previously considered by the Company, Zurich or by the public at large. As described below in greater detail, the Zurich policy at issue here provides coverage for "*all risks of direct physical loss of or damage from any cause unless excluded*." And the Zurich policy at issue here contains no exclusion for viruses or infectious diseases.

**B.    The COVID-19 Pandemic**

18.    COVID-19 is a severe infectious disease caused by the novel coronavirus.  COVID-19 is responsible for over 109 million reported cases and at least 2.4 million deaths worldwide.[1]  Unlike other members of the coronavirus family, which tend to cause mild-to-moderate upper respiratory tract illness, the novel coronavirus causes serious systemic illness and death.[2]  COVID-19 has been declared a global pandemic by the World Health Organization ("WHO"),[3] and as such, the disease and its causative virus, novel coronavirus, are presumed to be present or imminently present everywhere.[4]

19.    The existence and/or presence of the novel coronavirus and COVID-19 is not simply reflected in reported cases or individuals' positive test results.  The Centers

---

[1]    Sergio Hernandez, Byron Manley, Henrik Pettersson, *Tracking coronavirus' global spread*, CNN Health (last updated Feb. 28, 2021), https://www.cnn.com/interactive/2020/health/coronavirus-maps-and-cases/ (last visited Feb. 28, 2021).

[2]    Tianna Hicklin, *Immune cells for common cold may recognize SARS-COV-2*, NAT. INST. OF HEALTH (Aug. 18, 2020), https://www.nih.gov/news-events/nih-research-matters/immune-cells-common-cold-may-recognize-sars-cov-2 (last visited Feb. 28, 2021).

[3]    WHO, *WHO Director-General's opening remarks at the media briefing on COVID-19* (Mar. 11, 2020), https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited Feb. 28, 2021).

[4]    *See, e.g.*, Christopher Ingraham, *At the population level, the coronavirus is almost literally everywhere*, WASH. POST, Apr. 1, 2020, https://www.washingtonpost.com/business/2020/04/01/population-level-coronavirus-is-almost-literally-everywhere/ (last visited Feb. 28, 2021).

4851-8118-9342.v3

for Disease Control and Prevention ("CDC") estimates that the number of people in

the United States who have been infected with COVID-19 is likely to be 10 times

higher than the number of reported cases.[5]  Additionally, at least 40% of people

infected with COVID-19 are asymptomatic.[6]  COVID-19 also includes a pre-

symptomatic incubation period of up to 14 days, during which time infected people

can transmit COVID-19 to people and onto surfaces without having experienced

symptoms and without realizing that they are infected.[7]  Studies have demonstrated

that pre-symptomatic individuals have an even greater ability to transmit COVID-19

than other infected people because they carry the greatest "viral load."[8]  The National

Academy of Sciences has concluded that "the majority of transmission is attributable

to people who are not exhibiting symptoms, either because they are still in the pre-

symptomatic stage or the infection is asymptomatic."[9]

20.    As early as February 26, 2020, the CDC advised that COVID-19 was

spreading freely without the ability to trace the origin of new infections, also known

---

[5]    Lena H. Sun and Joel Achenbach, *CDC chief says coronavirus cases may be 10 times higher than reported,* WASH. POST (June 25, 2020), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/ (last visited Feb. 28, 2021).

[6]    Ellen Cranley, *40% of people infected with covid-19 are asymptomatic, a new CDC estimate says,* BUS. INSIDER (July 12, 2020), https://www.businessinsider.com/cdc-estimate-40-percent-infected-with-covid-19-asymptomatic-2020-7 (last visited Feb. 28, 2021).

[7]    *See* WHO, *Coronavirus disease 2019 (COVID-19) Situation Report - 73* (Apr. 2, 2020), https://apps.who.int/iris/bitstream/handle/10665/331686/nCoVsitrep02Apr2020-eng.pdf?sequence=1&isAllowed=y (last visited Feb. 28, 2021); Minghui Yang , Liang Li , Ting Huang, Shaxi Li, Mingxia Zhang, Yang, Yujin Jiang, Xiaohe Li, Jing Yuan, and Yingxia Liu, *SARS-CoV-2 Detected on Environmental Fomites for Both Asymptomatic and Symptomatic Patients with COVID-19*, 203 AM. J. OF RESPIRATORY AND CRITICAL CARE MED. 3, 374-78 (Feb. 1, 2021), https://doi.org/10.1164/rccm.202006-2136LE (last visited Feb. 28, 2021).

[8]    *See, e.g.*, Xi He et al., *Temporal dynamics in viral shedding and transmissibility of COVID-19,* 26 NATURE MED. 672, 674 (Apr. 15, 2020), https://www.nature.com/articles/s41591-020-0869-5 (last visited Feb. 28, 2021); Lirong Zou et al., *SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients,* NEW ENG. J. OF MED. (Mar. 19, 2020).

[9]    Meagan C. Fitzpatrick, Alison P. Galvani, Seyed M. Moghadas, Abhishek Pandey, Pratha Sah, Affan Shoukat, and Burton H. Singer, *The implications of silent transmission for the control of COVID-19 outbreaks*, 117 PNAS 30, 17513-15, July 28, 2020 https://www.pnas.org/content/117/30/17513 (last visited Feb. 28, 2021).

-6-

4851-8118-9342.v3

1    as community transmission.

2        21.    On March 11, 2020, the WHO declared COVID-19 to be a global

3    pandemic.

4        22.    COVID-19 is highly contagious, uniquely resilient, and potentially

5    deadly.  The degree to which an infectious disease is contagious is measured by $R^0$, a

6    term that defines how many other people will become infected by one person with that

7    disease.  Studies have concluded that one person with the novel coronavirus will infect

8    up to 5.7 others ($R^0 \approx 5.7$), much higher than seasonal influenza for example, where

9    on average, one person will infect only 1.3 others ($R^0 \approx 1.3$).[10]

10       23.    The novel coronavirus can remain infectious for "much longer time

11   periods than generally considered possible."[11]  In the Journal of Virology, researchers

12   demonstrated that the novel coronavirus can survive up to 28 days at room

13   temperature ($68^\circ$F) on a variety of surfaces including glass, steel, vinyl, plastic, and

14   paper.[12]  A CDC report from March 27, 2020, stated that the novel coronavirus was

15   identified on surfaces of the cabins on board the Diamond Princess cruise ship 17 days

16   after the cabins were vacated but before they were disinfected.[13]  Numerous other

17   scientific studies and articles have identified the persistence of the novel coronavirus

18   on doorknobs, toilets, faucets and other high-touch points, as well as on commonly

19

20

21   _____

22   [10]    M. Cevik, C.C.G. Bamford, A. Ho, *COVID-19 pandemic-a focused review for clinicians*, 26 CLINICAL MICROBIOLOGY & INFECTION 7, 842-47 (July 2020), https://www.clinicalmicrobiologyandinfection.com/article/S1198-743X(20)30231-7/fulltext (last visited Feb. 28, 2021).

23   [11]    Shane Riddell, Sarah Goldie, Andrew Hill, Debbie Eagles & Trevor W. Drew, *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 VIROLOGY J. 145 (2020), https://doi.org/10.1186/s12985-020-01418-7 (last visited Feb. 28, 2021).

24   [12]    Shane Riddell, Sarah Goldie, Andrew Hill, Debbie Eagles & Trevor W. Drew, *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 VIROLOGY J. 145 (2020), https://doi.org/10.1186/s12985-020-01418-7 (last visited Feb. 28, 2021).

25   [13]    Leah F. Moriarty, Mateusz M. Plucinski, Barbara J. Marston, et al., *Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020*, 69 MMWR 12, 347-352, (Mar. 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm (last visited Feb. 28, 2021).

-7-

overlooked surfaces such as floors.[14]

24.    The WHO states that "[t]he disease spreads primarily from person to person through small droplets from the nose or mouth, which are expelled when a person with COVID-19 coughs, sneezes, or speaks . . . People can catch COVID-19 if they breathe in these droplets from a person infected with the virus . . . These droplets can land on objects and surfaces around the person such as tables, doorknobs and handrails.  People can become infected by touching these objects or surfaces, then touching their eyes, nose or mouth."[15]

25.    Respiratory transmission of COVID-19 occurs through exposure to an infected person's respiratory particles, such as from saliva or mucus.[16]  Respiratory transmission of the novel coronavirus is commonly divided into droplet (larger particles that have a transmission range of about six feet) and airborne (smaller particles that can remain suspended in the air for prolonged periods of time) modes of transmission.  Though convenient, this binary division is an oversimplification that underscores transmission risk.[17]  Humans produce a wide range of particle sizes when coughing, sneezing, talking, singing, or otherwise dispersing droplets, with pathogens predominating in the smallest particles.[18]  Respiratory particles produced by the average person can travel almost 20 feet by sneezing.[19]  An M.I.T. researcher has

---

[14]    Zhen-Dong Guo, Zhong-Yi Wang, Shou-Feng Zhang, Xiao Li, Lin Li, Chao Li, Yan Cui, Rui-Bin Fu, Yun-Zhu Dong, Xiang-Yang Chi, Meng-Yao Zhang, Kun Liu, Cheng Cao, Bin Liu, Ke Zhang, Yu-Wei Gao, Bing Lu, Wei Chen, *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China, 2020,* 26 EMERG. INFECT. DIS. 7, 1583-91 (July 2020), https://pubmed.ncbi.nlm.nih.gov/32275497/ (last visited Feb. 28, 2021).
[15]    *Q&A on coronaviruses (COVID-19)*, World Health Organization, https://web.archive.org/web/20200506094904/https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses (last visited Feb. 28, 2021).
[16]    *Id.*
[17]    Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, 8 LANCET RESPIRATORY MED. 9, P914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited Feb. 28, 2021).
[18]    *Id.*
[19]    *Id.*

-8-

found that virus-laden "clouds" containing clusters of droplets can travel 23 to 27 feet.[20]

26.    Airborne transmission involves the spread of the infectious agent caused by the dissemination of droplet nuclei (aerosols) from, for example, exhaled breath, that remain infectious when suspended in the air over long distances and durations.[21] These tiny particles can remain suspended "for indefinite periods unless removed by air currents or dilution ventilation."[22]  As a result, the risk of disease transmission increases substantially in enclosed environments, compared to outdoor settings.[23]

27.    The WHO and the scientific community have studied the spread of the novel coronavirus through aerosols in indoor settings via air circulation systems.  For example, the CDC published a research letter concluding that a restaurant's air conditioning system triggered the transmission of the novel coronavirus, spreading it

---

[20]    Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions, Potential Implications for Reducing Transmission of COVID-19*, 323 JAMA 18, 1837-38, Mar. 26, 2020, https://jamanetwork.com/journals/jama/fullarticle/2763852 (last visited Feb. 28, 2021).

[21]    *Id; see also* Jose-Luis Jimenez, *COVID-19 Is Transmitted Through Aerosols. We Have Enough Evidence, Now It Is Time to Act,* TIME, Aug. 25, 2020, https://time.com/5883081/covid-19-transmitted-aerosols/ (last visited Feb. 28, 2021); Ramon Padilla & Javier Zarracina, *WHO agrees with more than 200 medical experts that COVID-19 may spread via the air,* (last updated Sept. 21, 2020), www.usatoday.com/in-depth/news/2020/04/03/coronavirusprotection-how-masks-might-stop-spread-throughcoughs/5086553002/ (last visited Feb. 28, 2021); Nan Zhang, Jianjian Wei, Hui-Ling Yen, and Yuguo Li*, Short-range airborne route dominates exposure of respiratory infection during close contact,* 176 BLDG. AND ENV'T (June 2020).

[22]    Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, 8 LANCET RESPIRATORY MED. 9, P914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited Feb. 28, 2021).

[23]    Muge Cevik, Julia L Marcus, Caroline Buckee, & Tara C Smith, *Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) Transmission Dynamics Should Inform Policy*, CLINICAL INFECTIOUS DISEASES (2020), https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciaa1442/5910315 (last visited Feb. 28, 2021).

1   to people who sat at separate tables downstream of the restaurant's airflow.[24]

2       28.   Additionally, the CDC has stated that "there is evidence that under

3   certain conditions, people with COVID-19 seem to have infected others who were

4   more than 6 feet away" and infected people who entered the space shortly after the

5   person with COVID-19 had left.[25]  A recently published (February 2021) systematic

6   review of airborne transmission of the novel coronavirus corroborated the CDC's

7   concerns and recommended procedures to improve ventilation of indoor air

8   environments to decrease bioaerosol concentration and reduce the novel coronavirus'

9   spread.[26]

10      29.   The CDC has recommended "ventilation interventions" to help reduce

11  exposures to the airborne novel coronavirus in indoor spaces, including increasing

12  airflow and air filtration (such as with high-efficiency particulate air (HEPA)

13  fan/filtration systems).[27]  The CDC has recommended that in addition to ventilation

14  changes, health care providers make various modifications to their facilities, including

15

16

17  _____

18  [24]    Jianyun Lu, Jieni Gu, Kuibiao Li, Conghui Xu, Wenzhe Su, Zhisheng Lai, Deqian Zhou, Chao Yu, Bin Xu, and Zhicong Yang, *COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China, 2020,* 26 EMERGING INFECTIOUS DISEASES 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article (last visited Feb. 28, 2021); *see also* Keun-Sang Kwon, Jung-Im Park, Young Joon Park, Don-Myung Jung, Ki-Wahn Ryu, and Ju-Hyung Lee, *Evidence of Long-Distance Droplet Transmission of SARS-CoV-2 by Direct Air Flow in a Restaurant in Korea,* 35 J. KOREAN MED. SCI. 46 (Nov. 2020), https://doi.org/10.3346/jkms.2020.35.e415 (last visited Feb. 28, 2021).

19

20

21

22  [25]    CDC, *Ways COVID-19 Spreads* (updated Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-*getting*-sick/how-covid-spreads.html (last visited Feb. 28, 2021).

23

24  [26]    Zahra Noorimotlagh, Neemat Jaafarzadeh, Susana Silva Martínez, & Seyyed Abbas Mirzaee, *A systematic review of possible airborne transmission of the COVID-19 virus (SARS-CoV-2) in the indoor air environment*, 193 ENV'T RSCH. 110612, 1-6 (Feb. 2021), https://www.sciencedirect.com/science/article/pii/S0013935120315097?dgcid=rss_sd_all (last visited Feb. 28, 2021).

25

26

27  [27]    CDC, *Ventilation in Buildings* (updated Feb. 9, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html#:~:text=HEPA%20filters%20are%20even%20more,with%20SARS%2DCoV%2D2 (last visited Feb. 28, 2021).

28

-10-

installing barriers and creating outdoor triage stations.[28]  These and other remedial measures must be implemented, at high cost and extra expense, to reduce the amount of the novel coronavirus present in the space and make property safe for its intended use.  These extreme measures demonstrate that the novel coronavirus and COVID-19 cause direct physical loss of or damage to interior spaces.

30.    COVID-19 may also be transmitted to people from physical objects, materials or surfaces.  "Fomites" are physical objects or materials that carry, and are capable of transmitting infectious agents, altering these objects to become vectors of disease.[29]  Fomite transmission has been demonstrated as highly efficient for viruses, both from object-to-hand and from hand-to-mouth.[30]

31.    The WHO has described fomite transmission as follows:

Respiratory secretions or droplets expelled by infected individuals can contaminate surfaces and objects, creating fomites (contaminated surfaces).  **Viable SARS-CoV-2 virus and/or RNA detected by RT-PCR can be found on those surfaces for periods ranging from hours to days**, depending on the ambient environment (including temperature and humidity) and the type of surface, in particular at high concentration in health care facilities where COVID-19 patients were being treated.  Therefore, transmission may also occur indirectly through touching surfaces in the immediate environment or objects contaminated with virus from an infected person . . .[31] (Emphasis added).

---

[28]    CDC, *Infection Control Guidance* (updated Feb. 10, 2021), https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html (last visited Feb. 28, 2021).
[29]    Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/fomite (last visited Feb. 28, 2021).
[30]    P. Rusin, S. Maxwell, & C. Gerba, *Comparative surface-to-hand and fingertip-to-mouth transfer efficiency of gram-positive bacteria, gram-negative bacteria, and phage*, 93 J. OF APPLIED MICROBIOLOGY, 4, 585-92 (Sept. 18, 2002), https://pubmed.ncbi.nlm.nih.gov/12234341/ (last visited Feb. 28, 2021).
[31]    *See, e.g.*, WHO, *Transmission of SARS-CoV-2: implications for infection prevention precautions* (Jul. 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Feb. 28, 2021).

-11-

32.     In addition to studies cited by the WHO,[32] numerous other studies and scientific articles have discussed fomite transmission as a mode of virus transmission, including, but not limited to:

a.     A study of a COVID-19 outbreak published by the CDC identifying elevator buttons and restroom taps as possible causes of the "rapid spread of SARS-CoV-2" in a shopping mall in China.[33]

b.     A National Institutes of Health study published in the New England Journal of Medicine finding that the Coronavirus survives up to 4 hours on copper, up to 24 hours on cardboard, and up to 3 days on plastic and stainless steel, and suggesting that people may acquire the virus through the air and after touching contaminated objects.[34]

c.     An American Society for Microbiology article discussing fomite infection as involving both porous and non-porous surfaces, and occurring through a fomite's contact with bodily secretions, hands, aerosolized virus from talking, sneezing, coughing, etc., or other airborne viral particles that settle after a disturbance of a fomite (*e.g.*, shaking a contaminated blanket).[35]  According to the researchers, "[o]nce a fomite is contaminated, the transfer of infectious virus may readily occur between inanimate and animate objects, or vice versa, and between two separate fomites (if

---

[32]     *Id.*
[33]     CDC, Jing Cai, Wenjie Sun, Jianping Huang, Michelle Gamber, Jing Wu, Guiqing He, *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020*, 26 EMERGING INFECTIONS DISEASES 6 (June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last visited Feb. 28, 2021).
[34]     Stephanie A. Bone and Charles P. Gerba, *Significance of Fomites in the Spread of Respiratory and Enteric Viral* Disease, 73 APPLIED AND ENVIRONMENTAL MICROBIOLOGY 6, 1687-96 (Mar. 2007) https://aem.asm.org/content/73/6/1687 (last visited Feb. 28, 2021).
[35]     *Id.*

-12-

COMPLAINT
Case No. 8:21-CV-406

brought together)."[36]  Of course, materials like blankets, hospital beds, computer terminals and a huge variety of medical equipment that come into contact with droplets and hands are handled thousands of times a day.  Generally, frequently touched surfaces can become highly transmissive fomites.[37]

    d.    A CDC research letter reporting that the novel coronavirus can remain viable on polystyrene plastic, aluminum, and glass for 96 hours in indoor living spaces.[38]

    e.    A *Journal of Hospital Infection* article citing studies revealing that human coronaviruses can persist on inanimate surfaces like metal, glass, or plastic for up to 9 days.[39]

33.    Importantly, the novel coronavirus has been detected on environmental objects and surfaces from both symptomatic and asymptomatic individuals.[40]  Fomites transform the surface of property into a potentially deadly novel coronavirus transmission device.  A study published in the Journal of Epidemiology and Infection demonstrated that after lockdown in the United Kingdom, novel coronavirus transmission via fomites may have contributed to as many as 25% of deaths in that

---

[36]    *Id*.

[37]    *Id*.

[38]    CDC, Boris Pastorino, Franck Touret, Magali Gilles, Xavier de Lamballerie, and Rémi N. Charrel, *Prolonged Infectivity of SARS-CoV-2 in Fomites*, 26 EMERGING INFECTIOUS DISEASES 9 (Sept. 2020), https://wwwnc.cdc.gov/eid/article/26/9/20-1788_article (last visited Feb. 28, 2021).

[39]    G. Kampf, D. Todt, S. Pfaender, E. Steinmann, *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, J. OF HOSPITAL INFECTION 104, 246-51 (2020), https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3 (last visited Feb. 28, 2021).

[40]    Minghui Yang, Liang Li, Ting Huang, Shaxi Li, Mingxia Zhang, Yang, Yujin Jiang, Xiaohe Li, Jing Yuan, and Yingxia Liu, *SARS-CoV-2 Detected on Environmental Fomites for Both Asymptomatic and Symptomatic Patients with COVID-19*, 203 AM. J. OF RESPIRATORY AND CRITICAL CARE MED. 3, 374-78 (Dec. 16, 2020), https://doi.org/10.1164/rccm.202006-2136LE (last visited Feb. 28, 2021).

-13-

region.[41]

34.    Accordingly, the presence of the novel coronavirus in and on property, including in indoor air, on surfaces, and on objects, causes direct physical loss of or damage to property by causing physical harm to and altering property and otherwise making it incapable of being used for its intended purpose.

35.    Among other things, the presence of the novel coronavirus transforms everyday surfaces and objects into fomites, causing a tangible change of the property into a transmission vehicle for disease from one host to another.  The WHO's description of fomite transmission of COVID-19 expressly recognizes this physical alteration of property, describing viral droplets as "**creating** fomites (contaminated surfaces)"[42] (emphasis added).  "Creating" involves making or bringing into existence something new[43] – such as something that is in an altered state from what it was before the novel coronavirus was present on, in and around the property.

36.    The novel coronavirus adheres to surfaces and objects, harming and physically changing and physically altering those objects by becoming a part of their surface and making physical contact with them unsafe for their ordinary and customary use.  Once the novel coronavirus is in, on, or near property, it is easily spread by the air, people and objects from one area to another, causing additional direct physical loss of or damage.

37.    Additionally, the presence of the novel coronavirus in and on property, including in indoor air, on surfaces, and on objects, renders the property unsafe and

---

[41]    A. Meiksin, *Dynamics of COVID-19 transmission including indirect transmission mechanisms: A mathematical analysis*, 148 EPIDEMIOLOGY & INFECTION e257, 1-7 (2020), https://www.cambridge.org/core/journals/epidemiology-and-infection/article/dynamics-of-covid19-transmission-including-indirect-transmission-mechanisms-a-mathematical-analysis/A134C5182FD44BEC9E2BA6581EF805D3 (last visited Feb. 24, 2021).

[42]    *See, e.g.*, WHO, *Transmission of SARS-CoV-2: implications for infection prevention precautions* (Jul. 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Feb. 28, 2021).

[43]    *See, e.g.,* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/create (last visited Feb. 28, 2021).

-14-

unfit for its normal usage.  Respiratory particles (including droplets and airborne aerosols) and fomites are physical substances that alter the physical properties of the interiors of buildings to make them unsafe, untenantable and uninhabitable.

38.    In addition to being found in air samples,[44] the novel coronavirus remains stable in body secretions (respiratory, urine, feces), on surfaces, and in sewage, particularly at lower temperatures.[45]

39.    A number of studies have demonstrated that the novel coronavirus is "much more resilient to cleaning than other respiratory viruses tested."[46]  The measures that must be taken to remove the novel coronavirus from property are significant and far beyond ordinary cleaning.

40.    Efficacy of decontaminating agents for viruses are based on a number of factors, including the initial amount of virus present, contact time with the decontaminating agent, dilution, temperature, and pH, among many others. Detergent surfactants are not recommended as single agents, but rather in conjunction with complex disinfectant solutions.[47]

41.    Additionally, it can be challenging to accurately determine the efficacy of decontaminating agents.   The toxicity of an agent may inhibit the growth of cells used to determine the presence of virus, making it difficult to determine if lower levels of infectious virus are actually still present on treated surfaces.[48]

---

[44]    Zhen-Dong Guo, Zhong-Yi Wang, Shou-Feng Zhang, Xiao Li, Lin Li, Chao Li, Yan Cui, Rui-Bin Fu, Yun-Zhu Dong, Xiang-Yang Chi, Meng-Yao Zhang, Kun Liu, Cheng Cao, Bin Liu, Ke Zhang, Yu-Wei Gao, Bing Lu, Wei Chen, *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China*, 2020, 26 EMERG. INFECT. DIS. 7, 1583-91 (July 2020), https://pubmed.ncbi.nlm.nih.gov/32275497/ (last visited Feb. 28, 2021).
[45]    Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. OF MED. VIROLOGY 11, 2498-510 (June 2020), https://doi.org/10.1002/jmv.26170 (last visited Feb. 28, 2021).
[46]    *Id.*
[47]    *Id.*
[48]    Muge Cevik, Julia L Marcus, Caroline Buckee, & Tara C Smith, *Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) Transmission Dynamics Should Inform Policy*, CLINICAL INFECTIOUS DISEASES (2020), https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciaa1442/5910315 (last visited Feb. 28, 2021).

-15-

42.     In order to be effective, cleaning and decontamination procedures require strict adherence to protocols not necessarily tested under "real life" or practical conditions, where treated surfaces or objects may not undergo even exposure or adequate contact time.[49]  Studies of coronaviruses have demonstrated viral RNA persistence on objects despite cleaning with 70% alcohol.[50]

43.     When considering disinfection and decontamination, the safety of products and procedures must be considered as well, due to the risks of harmful chemical accumulation, breakdown of treated materials, flammability, and potential for allergen exposure.[51]

44.     With respect to textiles, studies have demonstrated that virus can survive on fabrics and be transferred to skin and other surfaces, "suggesting it is biologically plausible that . . . infectious diseases can be transmitted directly through contact with contaminated textiles."[52]

45.     In fact, via its corporate web pages, Zurich has admitted to the physical dangers associated with the novel coronavirus, advising its customers to rely on scientific studies by the New England Journal of Medicine, The Centers for Disease Control, and other such sources concerning how long the virus survives on surfaces and touch points like door handles and counters. Zurich has underscored the need to repeatedly disinfect these surfaces. *See, e.g.,* https://www.zurichna.com/knowledge/articles/2020/05/disinfecting-offices-and-facilities-during-the-covid-19-crisis (last checked February 28, 2021).

---

[49]     *Id.*
[50]     Joon Young Song, Hee Jin Cheong, Min Joo Choi, Ji Ho Jeon, Seong Hee Kang, Eun Ju Jeong, Jin Gu Yoon, Saem Na Lee, Sung Ran Kim, Ji Yun Noh, & Woo Joo Kim, *Viral Shedding and Environmental Cleaning in Middle East Respiratory Syndrome Coronavirus Infection*, 47 INFECTION & CHEMOTHERAPY 4, 252-5 (2015), https://www.icjournal.org/DOIx.php?id=10.3947/ic.2015.47.4.252 (last visited Feb. 28, 2021).
[51]     *Id.*
[52]     Lucy Owen and Katie Laird, *The role of textiles as fomites in the healthcare environment: a review of the infection control risk*, 8 PEER J. LIFE AND ENV'T e9790, 1-35 (2020), https://peerj.com/articles/9790/ (last visited Feb. 28, 2021).

-16-

46.    Given the inadequacy of conventional cleaning procedures, disinfection and decontamination measures include, but are not limited to, the use of harsh chemicals to perform deep disinfection, making changes to air filtration systems, and redesigning interior spaces.  These measures, that In-N-Out has actively taken, among others, demonstrate that the novel coronavirus and COVID-19 cause direct physical loss or damage to property.

47.    In-N-Out prioritizes the health and safety of its customers and employees.  It has worked closely with public health agencies during the pandemic, including by limiting staff to the minimum number necessary to serve its customers and using staff 'cohorts' to limit possible exposure.  The persistent presence of novel coronavirus makes this effort a potential mitigating force, but not a complete solution.

48.    In-N-Out also engages detailed contact tracing to identify and stop the spread of the novel coronavirus.  However, similar to the rest of the country, In-N-Out's best efforts cannot completely eliminate the presence of novel coronavirus on its premises.  Through its contact tracing, In-N-Out has confirmed that at most times throughout the pandemic, employees infected with the novel coronavirus were present at all of its more than 360 restaurant locations. Upon learning of an infected employee, In-N-Out undertook prompt and costly steps to immediately exclude the employee from the workplace to protect customers and employees, and to proactively identify those who came into close contact in order that they may quarantine.

49.    Contact tracing aside, it is statistically certain that any public restaurant, gym, retail store, hotel, casino or any business that admits members of the public has the novel coronavirus on premises.  Indeed, such businesses, including In-N-Out, invariably have cases of COVID-19 among their employees and customers – demonstrating beyond any doubt the presence of the novel coronavirus on premises.[53]

---

[53]    Chande, A., Lee et al., Real-time, interactive website for US-county-level COVID-19 event risk assessment. Nat. Hum. Behav. (Nov. 9, 2020), https://doi.org/10.1038/s41562-020-01000-9 (last visited February 28, 2021).

-17-

50.     While the damage and destruction caused by the original strain of the coronavirus is staggering, during the 2020/2021 Policy Period, completely new and distinct strains of the coronavirus have emerged that are even more transmissible and infectious than the original strains of the novel coronavirus.  These new strains of the coronavirus have caused yet more physical loss of or damage.

51.     In September 2020, a new strain, called B.1.1.7 of the novel coronavirus, thought to be nearly 70% more transmissible and infectious than the original strain, was identified in the U.K.[54]  As of January 2021, the U.K. strain of the novel coronavirus has been detected in 33 countries, including the United States (and in states such as California and Colorado, where In-N-Out maintains its Stores).[55]

52.     In October 2020, yet another new strain of the novel coronavirus was identified in South Africa, which is purportedly more contagious than the original strain as it has been associated with a higher viral load.[56]

53.     In January 2021, studies identified a new variant of the novel coronavirus in the United States, identified as COH.20G/501Y, that did not come from the U.K. or South African branches of the virus.[57]  Similar to the U.K. strain, the mutations in the

---

[54]     Julia Ries, *The Coronavirus is Mutating: What We Know About the New Variants*, healthline (January 22, 2021), https://www.healthline.com/health-news/the-coronavirus-is-mutating-what-we-know-about-the-new-variants (last visited February 28, 2021); *About Variants*, CDC (last updated February 12, 2021),  https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html (last visited February 28, 2021).
[55]     Gabrielle Masson, *UK virus strain in 3 states; South Africa variant deemed 'even more of a problem': 5 thing to know*, Becker's Hospital Review (Jan. 4, 2021), https://www.beckershospitalreview.com/public-health/uk-virus-strain-in-3-states-south-africa-variant-deemed-even-more-of-a-problem-5-things-to-know.html (last visited Feb. 28, 2021).
[56]     Julia Ries, *The Coronavirus is Mutating: What We Know About the New Variants*, healthline (January 22, 2021), https://www.healthline.com/health-news/the-coronavirus-is-mutating-what-we-know-about-the-new-variants (last visited February 28, 2021); *About Variants*, CDC (last updated February 12, 2021),  https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html (last visited February 28, 2021).
[57]     *Researches Discovery New Variant of COVID-19 Virus in Columbus, Ohio*, Ohio State Univ. (Jan. 13, 2021), https://wexnermedical.osu.edu/mediaroom/pressreleaselisting/new-sars-cov2-variant (last visited February 28, 2021).

-18-

new variant of the virus likely make the novel coronavirus more infectious.[58]  Another strain, identified as L452R, that originated in Denmark has been "ripping" through Northern California and has been confirmed in more than a dozen other states.[59]

54.     It is not yet clear if the several vaccines that are in limited distribution in the United States at this time will protect against these new strains.[60]

55.     Since the 2020/2021 Policy renewal and amid the pandemic, In-N-Out has opened new restaurant locations.  For example, In-N-Out opened two restaurants in Aurora and Colorado Springs, Colorado, that are covered under the 2020/2021 Policy Period.[61]  These locations have also seen outbreaks of the novel coronavirus among its employees on its premises.

56.     Information about these new and more virulent strains of coronavirus is ongoing, but it is near certain that In-N-Out locations have been exposed to these strains, in addition to experiencing persistent physical loss of and damage to its restaurants from the original coronavirus and COVID-19.

## C.     Government Orders and the Closure of In-N-Out Restaurants

57.     On March 16, 2020, the CDC and the national Coronavirus Task Force issued to the American public guidance titled "30 Days to Slow the Spread" of COVID-19. The guidance called for extreme social distancing measures, such as working from home, avoiding gatherings of more than 10 people, and staying away from bars and restaurants.

---

[58]     *Id.*

[59]     *Another coronavirus variant linked to growing share of cases, several large outbreaks, in California*, The Wash. Post (Jan. 18, 2021), https://www.washingtonpost.com/health/2021/01/18/california-coronavirus-variant/ (last visited February 28, 2021).

[60]     "South Africa Coronavirus Variant Detected in U.S."  The Wall Street Journal, January 28, 2021 (last checked February 28, 2021), http://www.wsj.com/articles/south-africa-coronavirus-variant-detected-in-u-s-11611852508

[61]     *Colorado's two In-N-Out locations declared COVID-19 outbreaks as 80 employees test positive*. The Denver Post, December 24, 2020.  https://www.denverpost.com/2020/12/24/in-n-out-burger-covid-outbreaks-colorado/ (last checked February 28, 2021).

-19-

4851-8118-9342.v3

58.    State governments across the nation recognized the unprecedented and catastrophic situation, with California, Arizona, Nevada, Utah, Oregon, Texas, and Colorado making "State of Emergency" declarations in early March.  Within a short time, these states issued orders suspending or severely limiting business operations of non-essential businesses where people could potentially contract COVID-19 from others or the property itself.  This included closing restaurant dining rooms.

59.    Simultaneously or shortly thereafter, states across the country issued orders encouraging or requiring citizens to "shelter in place" or "stay at home."

60.    In many instances, city and county governments issued their own restrictive orders, which among other things closed restaurant dining rooms.

61.    On March 19, 2020, the City of Los Angeles issued its "Safer at Home" order "because, among other reasons, the COVID-19 virus can spread easily from person to person and it is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time."[62]

62.    On March 31, 2020, Dallas County, Texas issued an order stating that "the COVID-19 virus causes property loss or damage due to its ability to attach to surfaces for prolonged periods of time…"[63]

63.    On March 17, 2020, Orange County issued its "Order of the Local Health Officer" prohibiting "all public and private gatherings of any number of people occurring outside a single household" and ordering that "all restaurants and other establishments that serve food shall close all on-site dining consistent with guidance

---

[62]    Public Order Under City of Los Angeles Emergency Authority, Issue Date March 19, 2020. (last checked May 19, 2020)
https://www.lamayor.org/sites/g/files/wph446/f/page/file/20200513%20Mayor%20Public%20Order%20SAFER%20AT%20HOME%20ORDER%202020.03.19%20%28REV3%202020.05.13%29X.pdf
[63]    Amended Order of County Judge Clay Jenkins, Issue date March 31, 2020.  (last checked May 19, 2020)
https://www.dallascounty.org/Assets/uploads/docs/covid-19/orders-media/033120-DallasCountyOrder.pdf

-20-

1   provided by the California Department of Public Health…"[64]

2       64.    On March 27, 2020, San Diego County issued its "Order of the Health

3   Officer and Emergency Regulations" ordering all restaurants to close their dining

4   rooms.  The order also required essential service providers to follow a strict social

5   distancing and sanitation protocol. The protocol requires the following mandatory

6   procedures: "Disinfecting wipes that are effective against COVID-19 are available

7   near shopping carts and shipping baskets; Employee(s) assigned to disinfect carts and

8   baskets regularly; Hand sanitizer, soap, and water, or effective disinfectant is available

9   to the public at or near the entrance of the facility, at checkout counters, and anywhere

10  else inside the store or immediately outside where people have direct interactions;

11  Disinfecting all payment portals, pens, and styluses after each use; [and] Disinfecting

12  all high-contact surfaces frequently."[65]

13      65.    On March 16, 2020, the City and County of San Francisco issued its

14  shelter in place "Order of the Health Officer No. C19-07" stating:

15          The virus that causes Coronavirus 2019 Disease ("COVID-19") is easily
16          transmitted, especially in group settings, and it is essential that the spread
            of the virus be slowed to protect the ability of public and private health
17          care providers to handle the influx of new patients and safeguard public
            health and safety. Because of the risk of the rapid spread of the virus, and
18          the need to protect all members of the community and the Bay Area
19          region, especially including our members most vulnerable to the virus
            and also health care providers, this Order requires all individuals
20

21

22  [64]    Order of the Local Health Officer.  Issue Date March 17, 2020. (last checked February 28,
23  2021)
    https://cms.ocgov.com/civicax/filebank/blobdload.aspx?BlobID=114362&fbclid=IwAR1DksYgc1F
24  kbpPnypqiHK8pNYojOnKaviWFjd6FIbqYVM8MsRxsMm9YoFw
    [65]    "Order of the Health Officer and Emergency Regulations" issued March 17, 2020 and
25  updated February 6, 2021. (last checked February 28, 2021)
    https://www.sandiegocounty.gov/content/dam/sdc/hhsa/programs/phs/Epidemiology/HealthOfficerO
26  rderCOVID19.pdf
    See also "Social Distancing and Sanitation Protocol" issued May 21, 2020. (last checked February
27  28, 2021)
    https://www.sandiegocounty.gov/content/dam/sdc/hhsa/programs/phs/Epidemiology/covid19/SOCI
28  AL_DISTANCING_AND_SANITATION_PROTOCOL_04022020_V1.pdf

-21-

anywhere in San Francisco to shelter in place—that is, stay at home…

It further orders that all "[r]estaurants and cafes—regardless of their seating capacity—that serve food are ordered closed except solely for takeout and delivery service."[66]

66.    The counties of Santa Clara, San Mateo, Marin, Contra Costa, and Alameda issued near identical orders.  On March 31, 2020, the City and County of San Francisco updated its order as follows:

It is now well established that the virus that causes Novel Coronavirus 2019 Disease ("COVID-19") is easily transmitted, especially in group settings, and that the disease can be extremely serious. It can require long hospital stays, and in some instances cause long-term health consequences or death. It can impact not only those known to be at high risk but also other people, regardless of age. This is a global pandemic causing untold societal, social, and economic harm. To mitigate the harm from the pandemic, on March, 16, 2020, the City and County of San Francisco, along with a group of five other Bay Area counties and the City of Berkeley, issued parallel health officer orders imposing shelter in place limitations across the Bay Area, requiring everyone to stay safe at home except for certain essential needs. Other jurisdictions in the Bay Area and ultimately the State have since joined in adopting stay safe at home orders.[67]

67.    On March 17, 2020, Mayor Kate Gallego of Phoenix, issued the following proclamation "Based on input from healthcare professionals, business leaders, & community members, PHX is declaring a state of emergency forcing immediate closure of bars & moving restaurants to delivery/take-out/drive-thru only starting 8PM tonight."[68]

---

[66]    "Order of the Health Officer No. C19-07" issued March 16, 2020.  (last checked May 22, 2020). https://www.sfdph.org/dph/alerts/files/HealthOrderC19-07-%20Shelter-in-Place.pdf
[67]    "Order of the Health Officer No. C19-07b" issued March 31, 2020.  (last checked May 22, 2020). https://www.sfdph.org/dph/alerts/files/HealthOfficerOrder-C19-07b-ShelterInPlace-03312020.pdf
[68]    https://twitter.com/MayorGallego/status/1240001629073469440

-22-

68.    On March 17, 2020, the City of Tucson issued its "Proclamation of the Mayor Declaring an Emergency or Local Emergency" stating:

> Whereas, in the last several days, the Mayors of various Arizona cities and towns, including Flagstaff, Yuma, Prescott Valley, Gilbert and others have issued proclamations declaring a local emergency in connection with the COVID-19 outbreak;…and whereas, emergency management measures are required to reduce the severity of the local emergency and mitigate the spread of COVID-19; and to protect the health, safety and welfare of the people and property located in the City of Tucson…
>
> It is proclaimed and ordered, effective immediately…to protect life and/or property and to promote public safety and welfare…all restaurants, food courts, cafes, coffeehouses, retail food facilities, and other similar business and establishes are prohibited from serving food and beverages for consumption on the premises.[69]

69.    On March 29, 2020, Salt Lake County issued a "Public Health Order" ordering "[d]ine-in food service, whether inside or outside the establishment is prohibited."  The order further instructed essential businesses to practice enhanced sanitation as follows:

> Reinforcing key messages to all employees, including staying home when sick, using appropriate cough and sneezing etiquette, and practicing appropriate handwashing…Performing frequent and enhanced environmental cleaning of commonly touched surfaces, such as workstations, countertops, railings, door handles, and doorknobs…Businesses that must accept cash, checks, or credit cards shall use cleansing measures between transactions, including any best practices issued by the Health Department. Cash transactions are discouraged, but not prohibited…Having hand sanitizer and/or sanitizing products readily available for employees and customers.[70]

70.    All of the communities with In-N-Out restaurant locations have been

---

[69]    "Proclamation of the Mayor Declaring an Emergency or Local Emergency" issued March 17, 2020.  (last check February 28, 2021). https://www.tucsonaz.gov/files/PROCLAMATION.pdf
[70]    "Public Health Order" issued March 29, 2020.  (last checked February 28, 2021). https://slco.org/globalassets/1-site-files/health/programs/covid/pho/pho3.pdf

subject to some form of commercial restriction, including complete closure of dining rooms, with varying degrees of severity ever since the COVID-19 pandemic began.

71.    As a result of the COVID-19 pandemic, the loss of or damage to property caused by the novel coronavirus, and in compliance with government guidance and orders, In-N-Out was forced to close all of its restaurant dining rooms. Government agencies have permitted reopening of dining rooms in phases, sometimes reversing that phasing in the face of a spike in infections.  This phasing varies by specific jurisdiction and there remains no indication of when In-N-Out restaurants will be fully functioning as they did before the pandemic.

72.    In-N-Out has suffered and continues to suffer significant losses from the closures of its dining rooms and related losses from the COVID-19 pandemic.  The presence of virus and individuals infected with the novel coronavirus and COVID-19 creates a distinct, demonstrable, physical alteration to In-N-Out's covered properties. This presence has at all times during the pandemic been a physical intrusion that compromises the physical integrity of In-N-Out's properties.  This direct physical loss has made the covered properties uninhabitable, inaccessible, and dangerous to use for their intended purpose.

**D.    The 2019/2020 and 2020/2021 Zurich Edge™ "All Risk" Commercial Property Policy**

73.    Zurich sold In-N-Out the Policy in exchange for a very substantial premium. The Policy provides coverage for property losses, for business interruption losses ("Time Element" per the policy language), and other losses. The Policy limit is $250 million per occurrence, which is subject to deductibles, sublimits, and other conditions described in relevant part below.

74.    The Policy contains sublimits for many losses, but other losses are simply subject to the full $250 million Policy limit, which applies to the 2019/2020 Policy Period and then again to the 2020/2021 Policy Period. For example, the Policy has no sublimit for Time Element (business interruption) meaning the full $250 million in

-24-

coverage is available for each Policy Period per occurrence. As other examples, the Policy limits coverage to $75 million for earth movement, $2 million for fine arts, $5 million per location for Contingent Time Element, and $1 million for losses from ammonia contamination. The Policy also contains some time limits on coverage. For example, coverage for gross earnings (part of Time Element) is limited to 24 months. Civil or Military Authority is limited $2.5 million per property and a 90-day time frame.

75.    The insuring clause in the 162-page Policy provides in relevant part that the Policy "[i]nsures against direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property, at an Insured Location. . ." The term "**Covered Cause of Loss**" is defined as "[a]ll risks of direct physical loss of or damage from any cause unless excluded."

76.    In several distinct ways, the Policy explicitly recognizes that contamination of property constitutes "direct physical loss of or damage" to property:

a.    First, the Policy contains a sublimit of $1 million for ammonia contamination.

b.    Second, the Policy extends coverage to radioactive contamination.

c.    Third, the Policy contains an exclusion removing certain types of contamination from coverage while leaving other types of contamination as covered. In the base Policy form, Zurich defined "Contamination" to include "pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent. . ." The base Policy form also defined "Contaminant" to include ammonia. But through an endorsement that was issued at the inception of coverage, the terms "contamination" and "contaminant" were redefined in relevant part to delete pathogen or pathogenic organism, bacteria, virus and disease-causing illness or agent and ammonia from the exclusion.

-25-

77.    As noted above, Zurich deleted the exclusion for ammonia contamination, and applied a $1 million sublimit to that loss only. With respect to pathogen or pathogenic organism, bacteria, virus and disease-causing illness or agent, the Policy does not apply a sublimit, meaning the entire $250 million limit is available for each Policy Period.

78.    The Policy covers In-N-Out's Time Element losses up to $250 million for each Policy Period, subject to the applicable deductible, based on the novel coronavirus and direct physical loss of or damage to property.

79.    The novel coronavirus has caused "direct physical loss of or damage to" In-N-Out property insured under the Policy.

80.    The Policy contains deductibles of $200,000 for Time Element per occurrence. The Policy contains a deductible of $200,000 for Contingent Time Element per location. The Policy contains other deductibles for specific properties and circumstances.

81.    The Policy contains a section entitled "Time Element Coverages" which insures In-N-Out's gross earnings. Within that section, coverage is extended for "Extra Expense" which covers the cost to resume normal business operations with a $10 million limit.

82.    The Policy also contains what are described as "Special Coverages." These include items such as "Civil or Military Authority," "Contingent Time Element," "Decontamination Costs," "Ingress/Egress," and many others.

83.    "Civil or Military Authority" coverage insures the Time Element Loss (gross earnings) resulting from "the necessary **Suspension** of the **Insured's** business activities at an Insured Location if the Suspension is caused by order of civil or military authority that prohibits access to the Location. That order must result from a civil authority's response to direct physical loss of or damage caused by a Covered Cause of Loss to property not owned, occupied, leased or rented by the insured" and within one mile of an insured location. As alleged above, state and local governments

-26-

4851-8118-9342.v3

issued orders closing In-N-Out's dining rooms in order to control spread of the virus and specifically because the virus is causing property loss or damage everywhere, including many places within one mile of In-N-Out locations. As a result of those civil orders, In-N-Out has suffered loss insured under the Policy.

84. "Contingent Time Element" coverage covers the gross earning loss "directly resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** results from the direct physical loss of or damage caused by [any non-excluded cause] to Property. . . at **Direct Dependent Time Element Locations**, **Indirect Dependent Time Element Locations**, and **Attraction Properties** located worldwide . . ." Attraction Properties are defined as properties that attract customers to the insured's business. In plain English, the Policy provides coverage for In-N-Out's losses if certain types of neighboring properties suffer property loss or damage of the type not excluded under the Policy. For example, In-N-Out operates stores near numerous universities and is highly popular with students. The closure of classes at UCLA, UC Irvine and elsewhere by reason of the coronavirus has resulted in covered loss of business for In-N-Out.

85. "Decontamination Costs" are covered to the sublimit where a law or ordinance regulating contamination results in increased cost of decontamination.

86. The insuring clause covers "loss of or damage to property," with the word "or" signifying that those are two different concepts. There is no requirement that the loss of property be permanent or complete. Here, In-N-Out is suffering both a "loss of" its dining rooms, *and* property damage based on the scientific studies quoted above.

87. Beginning with its introduction in 2008, Zurich marketed its Edge Policy form as offering uniquely "broader coverage and greater flexibility." Zurich's CEO made this announcement and lauded the clarity of the form. Zurich knew it was selling an insurance product that did not exclude loss from virus, which is demonstrated by its regulatory filings. In December of 2019, just before the novel coronavirus was

-27-

discovered, Zurich filed a regulatory request to modify its Policy language. Buried in the edits, and without reference to the significance of the change, Zurich's filing sought to add back an exclusion for virus, which it sought to have take effect in July 2020. Recognizing that the endorsement adding back coverage for virus, pathogen and other losses applies to cover losses in all 50 states regardless of location, in 2020 but after the In-N-Out 2020/2021 policy issued, Zurich further amended the endorsement to limit its application to one state only.

**E.     In-N-Out's Losses**

88.     A large percentage of In-N-Out's business derives from on-site dining in its dining rooms and via walk-up sales for its outside eating areas. Since mid-March, those dining rooms have been closed resulting in a substantial Time Element loss of the Company's "gross earnings" as insured under the Policy.

89.     In-N-Out has incurred and will incur "Decontamination Costs" under the Policy.

90.     While potentially and at least partially overlapping with its Time Element Loss, the gross earnings loss as covered under the Policy is also resulting as Contingent Time Element Loss given the closure of nearby properties, and Civil Authority loss as a result of Civil Orders as alleged above.

91.     As the nation continues working toward a path forward to reopening business, In-N-Out expects that it will incur Extra Expense as insured under the Policy. In-N-Out also expects that with the calculation of its full losses when better known, additional coverages under the Policy may be applicable.

**F.     Zurich's Denial of Claim**

92.     On January 28, 2021, counsel for In-N-Out gave counsel for Zurich notice of the claim for the 2020/2021 policy period. In doing so, Zurich was informed that In-N-Out had opened 8 stores since the prior policy period, confirmed that the presence of the virus had exploded far beyond what it knew in May 2020 when it filed Action 1, that nearly 5,000 In-N-Out associates and 100% of its locations had

-28-

confirmed cases, and that there had been several coronavirus-caused deaths among its associate population. Despite knowing these facts, Zurich maintained its position that coverage was not available for the new stores, based on the expanded infection at all In-N-Out stores, or based upon the Covid-19 variants now circulating and damaging people and property. On or about February 5, 2021, In-N-Out gave additional written notice via its broker to Zurich of its novel coronavirus loss for the 2020/2021 Policy Period.  Zurich acknowledged receipt via a form response. On February 8, Zurich provided a letter via its counsel denying the possibility of coverage regardless of the new facts and policy period.  Zurich maintains its refusal to acknowledge any coverage despite court orders specifically finding that Zurich owes coverage in other Covid-19 lawsuits, and other court orders in California specifically rejecting Zurich's pleading challenges made on the same bases it argues here.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract

93.    Plaintiff incorporates the above Paragraphs by reference.

94.    In-N-Out purchased insurance coverage as alleged above, and fully performed all of its obligations under that contract. In-N-Out timely submitted a claim as alleged above.

95.    Zurich denied coverage for the 2020/2021 Policy Period as alleged above, thereby breaching the contract.

96.    As a result of Zurich's breach, In-N-Out has suffered and continues to suffer significant monetary damages in an amount to be proven at trial, but which it believes exceeds $100 million.

## SECOND CLAIM FOR RELIEF

### (Breach of the Covenant of Good Faith and Fair Dealing)

97.    An implied covenant of good faith and fair dealing exists in every insurance contract in California and arose here as a result of Zurich's sale of the Policy to In-N-Out. Zurich's duty of good faith and fair dealing obligated Zurich to

-29-

consider In-N-Out's interests at least equal to its own interest; to full advise In-N-Out of all of its rights under the Policy and under the law with regards to claims arising thereunder; to acknowledge and act reasonably promptly upon communications with respect to claims arising under the Policy; to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under the Policy; to promptly affirm or deny coverage of claims within a reasonable period of time after presentation of a claim; and to avoid unreasonably withholding or delaying payment of any benefits owed under the Policy.

98.    Zurich breached its implied covenant of good faith and fair dealing owed to In-N-Out by, among other things, engaging in the following:

a.    Knowingly and intentionally failing to promptly and thoroughly investigate all possible bases to support In-N-Out's claim for coverage under the Policy; including a refusal to inquire as to the new In-N-Out locations; a refusal to inquire as to the specifics of the more than 4,700 positive diagnoses of In-N-Out associates; a failure to demonstrate that it considered the actual policy language; ignoring its own website postings confirming how the novel coronavirus survives for days on surfaces and in the air in enclosed spaces;

b.    Intentionally placing Zurich's interest in saving money ahead of its insured's interests in obtaining benefits which In-N-Out is rightfully entitled to under the Policy;

c.    Misrepresenting the terms of coverage in that Zurich added a virus exclusion into its policy form after the existence of the novel coronavirus became known;

d.    Misrepresenting the terms of coverage in that in 2020 Zurich created policy language seeking to limit coverage for virus on a geographic basis when virus coverage had previously not been

-30-

limited by location;

e.    Wrongfully denying In-N-Out's coverage forcing In-N-Out to file this litigation and incur expense in order to obtain the coverage it is entitled to.

## THIRD CLAIM FOR RELIEF

### (Declaratory Relief)

99.    Plaintiff incorporates the above Paragraphs by reference.

100.    An actual controversy exists between the parties within the meaning of California Code of Civil Procedure Section 1060.

101.    As such, this Court has the authority to issue a declaratory judgment concerning the respective rights and duties of In-N-Out and Zurich under the Policy.

102.    In-N-Out is entitled the declaratory relief establishing that the losses it has suffered are covered by the Policy.

## V.    **PRAYER FOR RELIEF**

WHEREFORE, In-N-Out prays for judgment as follows:

1.    On the First Claim for Breach of Contract:

(a)    For damages in an amount up to the Policy limit less a proper deductible.

2.    On the Second Claim for Breach of the Covenant of Good Faith and Fair Dealing:

(a)    For damages in an amount up to the Policy limit less a proper deductible;

(b)    For attorneys' fees and costs incurred by reason of forcing In-N-Out to litigate in order to obtain the benefits of the insurance it purchased.

3.    Third Claim for Relief for Declaratory Relief:

(a)    That this Court declare the rights, obligations and liabilities of the parties herein and specifically declare, as In-N-Out contends, that

-31-

COMPLAINT
Case No. 8:21-CV-406

1    the events and losses incurred as described in this complaint are

2    covered by the Policy.

3    4.    On all Claims:

4    (a)    For costs of suit incurred herein;

5    (b)    For interest at the maximum legal rate on all amounts owed under

6    the Policy, accruing from the date upon which amounts should have been paid;

7    (c)    For such other relief as the Court may deem just and proper.

8

9

Dated:  March 3, 2021                    PILLSBURY WINTHROP SHAW
10                                         PITTMAN LLP

11

_/s/ Robert L. Wallan_
12                     By:                Robert L. Wallan
13                                        Mariah L. Brandt
                                          Rebecca Tierney
14                                        Attorneys for Plaintiff
                                          IN-N-OUT BURGERS

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-32-